JOAN BERNARD ARMSTRONG, Chief Judge.
|!These appeals arise from a judgment of the trial court in a medical malpractice case. Plaintiffs, Walter and Carolyn Douglas, filed suit individually and on behalf of their minor daughter against three medical doctors: Michelle M. Zembo, John Noble, and Charles B. Hill. Doctors Zembo and Noble were employed by the State of Louisiana[1], and Dr. Hill[2] was a private physician.
The plaintiffs originally filed suit in 1995 against Children’s Hospital (CH), Dr. Zembo, and Dr. Hill, alleging that their negligence in connection with the patient’s distal femoral osteotomy of the right leg with internal fixation and fasciotomy, to *438 correct a bilateral valgus deformity, resulted in the below-knee amputation of the patient’s leg. Dr. Zembo and Dr. Hill filed exceptions of prematurity pursuant to La. R.S. 40:1299.39.1 and La. R.S. 40:1299.41 et seq., and Dr. Hill moved for sanctions under La.Code Civ. Proc. art. 863. By consent judgment of August 25, 1995, Dr. Zembo’s exception was granted and the petition |2as against her was dismissed without prejudice. The trial court on September 12, 1995, granted the plaintiffs’ motion to dismiss the petition as against Dr. Hill pending resolution of Medical Review Panel (MRP) proceedings, without prejudice to their proceeding against the defendants at the conclusion of the MRP proceedings. On October 24, 1995, the plaintiffs dismissed their suit against CH with prejudice. On Dr. Hill’s motion, the MRP was extended for two additional six-month periods for further discovery and submission of evidence[3]. The trial court granted subsequent requests for extension through February 1,1998.
Dr. Hill filed an exception of prematurity to the amending and supplemental petition and a motion for Article 863 sanctions. The trial court granted plaintiffs’ motion to dismiss the suit, without prejudice, on October 24,1996. On December 11,1997, the panel, consisting of Doctors Kenneth Fal-terman, Faith Hansbrough, and Rodney Steiner, rendered opinions in favor of the defendant doctors.
In June of 1996, the plaintiffs filed an amending and supplemental petition, naming the original defendants, including CH, John W. Noble, M.D., and the State of Louisiana, alleging inter alia, that the doctors were employees, agents, and/or associates of CH, and that they were in the course and scope of them employment “in conjunction with” the Louisiana State University Medical Center. Plaintiffs alleged that the State, through its Office of Risk Management, is vicariously liable in solido for their damages.
IsThe matter was set for trial, and upon the plaintiffs’ motion, was continued to be reset by Order of January 26, 2000. The trial court granted subsequent unopposed continuances pending, the taking of additional discovery. Ultimately, the trial was held in May of 2006. During the course of the trial, the plaintiffs settled their lawsuit against Dr. Hill[4], reserving their rights against the Patient’s Compensation Fund (PCF) as well as Doctors Zembo and Noble, and the case proceeded against the remaining defendants.
The jury found the defendant physicians at fault, allocated at 40% to Dr. Zembo; 20% to Dr. Noble; and 40% to the settling physician, Dr. Hill. It found that the patient had sustained damages, including past medical expenses ($275,000); future medical expenses ($300,000); past economic loss ($75,000); past and future pain and suffering ($1,500,000); loss of enjoyment of life and disfigurement ($1,000,000); and loss of future earning capacity ($500,000), for a total of $3,650,000. The jury awarded Mrs. Douglas $75,000 for loss of consortium and $150,000 for emotional distress, and awarded Mr. Douglas $10,000 for loss of consortium.
On July 13, 2007, the trial court granted the State’s unopposed Motion for Summary Judgment on the plaintiffs’ challenge to the constitutionality of La. R.S. 40:1299.42(B), dismissing that challenge with prejudice. The trial court entered judgment that same day granting the *439 State’s unopposed motion to exclude the testimony of Professor Paul W. Baier[5]. On July 23, 2007, following a | ¿contradictory hearing, the trial court granted the State’s Motion for Summary Judgment on the plaintiffs’ challenge to the constitutionality of La. R.S. 40:1299.39, dismissing that challenge with prejudice. The plaintiffs appealed the latter judgment in proceedings bearing Nos.2008-CA-0383 c/w 2008-CA-0384 on the docket of this Court. Because the summary judgment was not designated by the trial court to be a final, appealable judgment pursuant to La.Code Civ. Proc. art. 1915, this Court dismissed the consolidated appeal by order dated May 16, 2008, remanding the action to the trial court for further proceedings.
On remand, the trial court modified the jury’s verdict to conform to the provisions of the MLSSA, La. R.S. 40:1299.39, et seq. The trial court entered judgment against the State of Louisiana on November 10, 2009[6], awarding the minor child $500,000 in general damages and $275,000 in past medical expenses, together with all future medical expenses as they accrue, with legal interest from the date of judicial demand and for all costs of these proceedings.
On December 22, 2009, the plaintiffs filed a Motion for Devolutive Appeal from the trial court’s judgment. The trial court signed the appeal order on January 4, 2010[7]. On December 28, 2009, the State filed a Motion for Devolutive Appeal from the trial court’s judgment. The trial court signed the appeal order on December 29, 2009, and it was entered on the court minutes on December 30, 2009. The PCF filed a brief in support of the trial court’s judgment.
| sFor the reasons that follow, we amend and affirm the judgment of the trial court.
The plaintiff, Carolyn Douglas, testified that she is married and has one child, the plaintiff, Shametha Douglas (Shametha). At the time of the surgery in question, Shametha was social, active, outgoing and had many friends. She rode her bike, and played dodgeball and kickball despite a knock-knee condition. She attended Hammond Westside School, was thirteen years old and was in the 6th grade at the time of her surgery. Shametha was also diabetic, and was under treatment for that disease. Because of her knock-knee condition, she suffered a great deal of pain and fell down frequently because her legs would give out when she walked. Her physician referred her to Dr. Zembo at CH, who was highly recommended. Dr. Zembo examined Shametha and recommended surgery that the doctor described as simple surgery that would straighten her legs and ultimately stop her pain. She was advised that Shametha could expect to return home three days after the surgery. Mrs. Douglas did not recall any discussion that one of the risks of the surgery would be the possibility that Shametha’s artery or vein might be cut.
Mrs. Douglas obtained a second opinion from Dr. J.L. Fambrough in Hammond, and after having spoken to him, decided to authorize the surgery in the belief it would help alleviate Shametha’s pain. The surgery was scheduled for May 10, 1994, at CH. Dr. Zembo told her that Shametha *440 would be able to go home in a body cast three days after the surgery. Shametha went into the surgery as |f,scheduled, and, as the morning passed, Mrs. Douglas did not receive any updates from the CH staff, although parents of other surgical patients did receive updates. Mrs. Douglas was told the staff did not have any information on the progress of her daughter’s surgery. Ultimately, Mrs. Douglas spoke with Dr. Zembo, who told her there had been an accident in surgery, but did not give her details. Mrs. Douglas went to pray in the CH chapel and then returned to the surgery waiting area, where she was alone. She was later joined by members of her family and a friend, Lynn Wittie, who had provided medical transportation for Shametha over the prior three years. At midnight, a nurse told her that Shametha was in the CH intensive care unit (ICU). Mrs. Douglas asked to meet with Dr. Zem-bo and with Dr. Noble, who was working with Dr. Zembo, to no avail. She saw Shametha in the ICU, but the patient was heavily sedated and could not respond to her.
Shametha remained in ICU for two weeks, but her leg did not appear to be getting better. Her toes were black and appeared to be shriveling up, and had an odor. Mrs. Douglas’ experience as a nurse’s aide caused her to conclude from these conditions that the patient might lose her leg. Mrs. Douglas asked several times to speak with Dr. Zembo, but was able to speak only to Dr. Noble, who told her that Dr. Zembo would be in and only Dr. Zembo could advise her concerning her patient’s condition. Dr. Hill also told Mrs. Douglas that Dr. Zembo was the doctor in charge and she would have to speak with her.
During this period, Dr. Zembo performed five or six additional surgeries on the patient. Mrs. Douglas testified that no one explained these procedures to her; Lhowever, on cross-examination, she admitted that she signed consent forms for each of the procedures. She testified on re-direct examination that she understood that there were certain risks that might accompany the surgeries, but did not consent to the doctors’ making mistakes.
She saw Dr. Zembo in the hall and followed her to wait until the doctor had seen another patient, and asked Dr. Zem-bo if Shametha would lose her leg. The doctor told her she did not know, and that another procedure was planned for the next day. After that procedure, she spoke with Dr. Zembo again, who advised her that Shametha would lose her leg. She was with the child when Dr. Zembo told Shametha that her leg would have to be amputated. The child cried for a minute and said, “Okay, if it will get me out the pain.” Shametha was receiving morphine and the less effective Demerol at the time for pain. The jury was shown photographs of the child’s leg and foot before the amputation of the remainder of her leg.
After the amputation, Shametha was in a great deal of pain, and remained in the hospital for about another two weeks. Mrs. Douglas was not sure if Shametha received counseling or psychiatric treatment while she was in the hospital. Upon returning home, Shametha was distant. She would cry a great deal, and had nightmares in which a cat or a lion was eating her leg. She still wakes up during the night at times, screaming. Mrs. Douglas noticed that she and her daughter were not as close as they had been, and believes her daughter blames her for the surgery, since it would not have been done had Mrs. Douglas not given permission. | sShametha needed help bathing, getting into and out of bed, and using the bathroom. She no longer wanted to visit with *441 her Mends. Her parents built a ramp access to their home for the child’s wheelchair. When she returned to school, some of the students would get behind her and step on the back of her leg to see her fall and laugh at her. Another former Mend visited Shametha and went away laughing at her. Shametha no longer wanted to go to school and lost her academic motivation. However, she was able to return and graduate from high school.
Shametha has had trouble with prosthetic devices because they cause sores to form on her leg. As a result, she does not often wear her prosthetic leg.
Shametha Nicole Douglas Watson[8] testified at trial. Before her surgery, her knock-knee condition caused her to be in tremendous pain when playing, but she was able to ride a bicycle and had many Mends. When she was thirteen or fourteen years old, she saw Dr. Zembo, who told her that her legs could be straightened and the pain would stop, but did not tell her that there was a risk that she might lose her legs. She remembered going to the hospital for surgery and being afraid, but her mother told her that God would ultimately make it right and she should not worry. Her next memory was lying in the hospital bed for days in pain, not being able to move. The pain medication made her extremely sleepy, but when she woke there was more pain. She did not recall the surgeries subsequent to the initial operation, but did remember when Dr. Zembo told her that her leg would be cut off. She testified, “Oh man, I really can’t begin to explain [how she felt] |flbecause I’m not a killer or do I want to be a killer but I wanted to take her and just be done with her.” She did not feel she had any option to keep her leg, but was told that the amputation would end her pain.
After the operation, she returned home and learned to walk on a walker. On her return home, she was very nervous because people were always looking at her and she did not like all the attention. She did not go back to school immediately. She confirmed her mother’s testimony concerning her harassment when she returned to school. She dealt with that as she did with the pain from the surgery. She was reluctant to take pain medication, for fear of addiction. She also testified to an incident at school when she was tripped by students and fell on rocks causing the stump to bleed. Her mother came to school and took her to the hospital where the injury was treated.
She saw a psychiatrist, Dr. Delatte, in Baton Rouge. She felt that he sometimes helped her, but testified, “[N]o matter what anyone — I believe that nobody — what anybody tells you or tried to do they really can’t take the pain away, not mentally or physically because they really don’t know how you feel. Even if you were to explain they still can’t grasp what you are going through.” She testified that at times she blames herself for her situation, because she agreed to the initial surgery to correct the knock-knee condition, and even considered hurting herself. She described her nightmare in which she had a cat, although she does not like cats. In the dream someone starts up a dryer, the cat gets stuck in the dryer, and once the door flies open, the cat flies out and starts eating Shametha’s leg. She | inhad the nightmare for a long time and it scared her at the time. She said she is no longer angry with Dr. Zembo.
*442 Shametha testified concerning her relationship with her father, whom she described as a hard-working person who does not display his emotions. Before her leg was amputated, he would wake her every morning and fix her breakfast and ride bikes with her. After the amputation, she saw a tremendous difference in how he acted. He no longer awakens her for breakfast, but just leaves the house before dawn for work. They no longer ride bikes together. He works every day, no matter the conditions, and was at work on the day of the trial.
• Shametha testified that she does not wear her prosthesis because of a bad sore on her leg. When standing on the prosthesis for a long time, the leg sweats, and she has to remove the prosthesis before she walks very far.
Shametha was the first member of her family to graduate from high school, and intended to work. She has not looked for a job, because she is afraid that she would be the focus of unwanted attention and would not be able to do her job. She does not like to shop, because she feels everyone is looking at her and judging her.
Lynn Wittie, a former driver providing medical transportation, testified that since 1989 she has transported Shametha and her mother to and from medical facilities for treatment. Although a state freeze on provision of medical transportation forced Ms. Wittie out of business about six years ago, she has maintained her friendly relationship with the Douglas family, whom she described as “very special.”
|nMs. Wittie described Mrs. Douglas as a devoted, committed mother of her only child, Shametha. She described Shametha when they first met as a bright, active child, “always on the go” who was slowed down by her knock-knee condition. Ms. Wittie drove the Douglases to CH in New Orleans for medical treatment. She attended the pre-surgical appointments with the mother and daughter to assist Mrs. Douglas in understanding about the surgery. The expectation was that the surgery would require a three-day hospital stay, during which time Ms. Wittie planned to visit Shametha.
Ms. Wittie was in the surgery waiting room with Mrs. Douglas when Dr. Zembo brought news that caused Mrs. Douglas concern. Neither she nor Mrs. Douglas knew what was going on, only that a mistake had been made and Shametha would be in surgery a while longer. Ms. Wittie left to check on her patients at Charity Hospital, who were not yet finished, and returned to CH between three and four o’clock. Mrs. Douglas was alone in the surgery waiting room and, to her knowledge, no one had spoken to her. Ms. Wittie left to drive her patients back to Hammond, and called the waiting room around eight o’clock that evening, but Mrs. Douglas had no further information. Mrs. Douglas was very upset at that time. Ms. Wittie confirmed Mrs. Douglas’ testimony concerning Shametha’s being taken to ICU after the surgery and her lack of knowledge of the problem. Ms. Wittie came and went to and from CH during the next ten days, and ten or twelve days after the surgery, she visited Shametha and saw the patient’s foot was black. She advised Mrs. Douglas to take pictures of the foot. Mrs. Douglas | ,2cried in the bathroom and in the hallway because she did not want to cry in front of her child.
Shametha was in a great deal of pain, and was asking for her morphine medicine. A few days later, when Ms. Wittie entered the room, she smelled a stench as of rotten meat. She advised Mrs. Douglas to get in touch with someone to tell her what was happening. The nurses came and went, but did not seem to know anything. She confirmed Mrs. Douglas’ testimony con *443 cerning the meeting in the hallway with Dr. Zembo, and the surgeries to clean and debride Shametha’s wounds. She visited the child shortly after she was advised of the necessity of the amputation, and described the child as dazed and Mrs. Douglas as shattered. After the amputation, things proceeded slowly, with more de-bridements, and “all that liveliness was drained from that child.” Shametha told her she was worried she would not get a boyfriend, be able to dance, ride a bike, or do the things that children with two legs could do. Shametha asked Ms. Wittie to take a picture of the new bike she had enjoyed riding and which she could no longer ride. Ms. Wittie confirmed the testimony of Mrs. Douglas and Shametha concerning the child’s harassment.
When Shametha arrived home and got out of the ambulance, her father broke down “like a baby.” Ms. Wittie said she had never seem him demonstrate emotion before. She described Mr. Douglas as a simple, hardworking man who takes providing for his family very seriously. She testified that although Mrs. | ^Douglas has adjusted to the situation she still blames herself for having agreed to the surgery.
Dr. Zembo testified that she is a board certified specialist in pediatric orthopedic surgery, and was Shametha’s doctor at the time of the surgery that is the subject of this litigation. She was in charge of the osteotomy portion of the treatment, that involved taking a wedge out of the femur. During the course of the osteotomy, there was an injury to the blood vessels in Shametha’s leg. When asked if she or Dr. Noble, whom she supervised during the operation, made any mistakes in the execution of the surgery, she responded, “Other than saying that the vessels were transected, and that is a known complication. I did all the things that were standard of care to protect those vessels.” She characterized transection of the popliteal artery and vein as something that happened that would not happen in a routine situation. Because of the nature of the clean cut, she thought it was possible the tran-section could have been caused by a sharp instrument.
Dr. Zembo explained the procedure needed to remedy Shametha’s knock-knee condition. The condition occurs when one side of the bone is longer than the other. In order to straighten the leg, the surgeon takes a wedge out of the bone to make the long side shorter or more appropriate to the other side, and then straightens it out. The surgeon makes an approach to the end of the femur on the inside of the knee from the knee towards the hip, going down through the skin and the soft tissue, identifying the muscles, then going through the muscle plane. The surgeon goes between two muscles so that muscle is not being cut through, and the 114muscle is pulled away from the bone. The periosteum covers the bone and thins out as a child matures. The surgeon cuts the periosteum with a knife and lifts the periosteum and soft tissue, including blood vessels and nerves, away from the bone using an elevator. She testified that she probably used an elevator as a retractor, and might have used another kind of elevator called a channeler and a malleable retractor. The purpose of these retractors and elevators is to protect the various structures. When this equipment is properly in place, they shield the vessels that were cut in Shame-tha’s procedure. The surgeon begins by cutting the bone with a saw and finishes' with a chisel and a hammer. Dr. Zembo demonstrated the procedure during her cross-examination. During the process of using the chisel, the chisel is pointed parallel to the vessels. Dr. Zembo testified that she is “extra careful” when using a saw or a chisel. During the patient’s operation, Dr. Noble, who was at that time finishing *444 his fourth year as a resident in orthopedic surgery, was using the cutting devices and Dr. Zembo was holding the retractors. She testified that since the injury took place, and the properly placed retractors would have protected the vessels, at some point she could only guess that the retrac-tors had to have moved. She also agreed that it was possible that the osteotome or chisel slipped in an unintended direction causing the injury to the vessels.
Dr. Zembo then explained the continuation of the surgical procedure following the placement of the elevators or retractors. Before the cutting occurs, the doctors put several guide pins in under image to fix where the chisel, as entry tool, will be used. A blade point having a fixed attachment that goes into the bone 115and a plate that goes alongside the bone are placed parallel to the joint at the correct angle and the correct distance from the joint. Above that, the doctor places guide wires to show exactly where the bone will be cut and how large a wedge will be taken out. Initially, the doctor puts a chisel connected to the blade plate separate from the chisel to be used for cutting, in to the end of the femur where part of the plate will be inserted. That chisel is inserted with a mallet. Then having reference to the two wires, the doctor cuts one part way through, then cuts the other part way through, completing them either with an osteotome or saw. The doctor in this case cut the inside of the leg, and the outer part of the bone with the saw and then took the kind of chisel or osteotome that was shown to counsel to cut the harder parts of the outside and on the far side, and then the wedge of bone was removed. The doctor then checked for position and alignment, put the plate in, and inserted screws to hold the plate in place. At that point, the surgery is completed. At that point, three hours after the tourniquet had been applied at the beginning of the surgery, it was let down and Dr. Zembo discovered the blood flow from the transected artery and vein. She had the tourniquet put back up so that they could try to find the source of the bleeding, and asked if there were other pediatric surgeons in the operating suite. The nurses attempted to contact Dr. Hill. Dr. Zembo and Dr. Noble attempted without success to locate the bleeding vessels while waiting for Dr. Hill to arrive. Dr. Zembo testified that she had never had a prior incident where the popliteal artery and vein had been transected in this 11fiprocedure, and would not have had a pediatric surgeon available to remedy the situation since it had never occurred in her experience.
When Dr. Hill arrived, he let down the tourniquet to try to find the affected vessels. Dr. Zembo testified that she would not have told Dr. Hill that the use of systemic Heparin[9] was contraindicated at that time.
Dr. Zembo did not recall having discussed with Dr. Hill how the vessels may have become transected, nor did she recall having had such a discussion with Dr. Noble or her other associates.
She testified that whenever an orthopedic surgeon performs osteotomies, which involve cutting the bone, there are vessels and other anatomic structures which are close, and, in the best of cases, following the standard of care, can be injured. Surgeons inform patients of the risk of damage to nerves and blood vessels before the procedures, when the patients are signing the consent. She admitted that she did not at any time ask Mrs. Douglas to consent to a clean transection of the popliteal artery and vein; however among the risks noted on the consent form are injury to *445 nerves and blood vessels, need for further surgery, failure to heal, infection, and loss of limb. Loss of limb can be caused by circulatory problems, ultimately from infection or a number of issues, including risk of injury during the surgical procedure.
Dr. Zembo was cross-examined on her decision to perform Shametha’s surgery at CH, when the patient was essentially the size and body corpus of an 117adult, and her growth plates were closed. She testified that at that time and at the time of trial she operated at CH, and was not under the impression that CH lacked the equipment to fix the transection. At the time she became aware of the problem, she asked if any pediatric surgeon was in the room and, upon finding none, asked specifically for Dr. Hill. She was confident he could make the appropriate repair.
Dr. Zembo testified that the distal femoral osteotomy took three hours, within the normal range. During this time, the tourniquet was applied and the patient’s leg was without blood and oxygen. When asked if the standard of care is two hours rather than three, Dr. Zembo replied that the standard of care can be up to three hours or more and, in fact, there are numerous reports stating there are no upper limits for lower extremity tourniquet elevation. She admitted that had she let the tourniquet down and reperfused at two or two and a half hours, this would allow blood back into the leg, refreshing it. She testified that it takes six to eight hours for a limb to die, although problems start occurring before that point. She concluded that the injury to the popliteal artery and vein is a known risk of the surgery, and that she followed the standard of care in the operation.
Dr. Zembo testified that the patient’s diabetes, the condition of her body, and the actions of the patient and her parents played no part in causing or contributing to her injury.
Defendant John Wallace Noble, Jr., M.D., an orthopedic surgeon, testified at trial. At the present time, he is a general orthopedic surgeon with a subspecialty in |1Rspine surgery and hip disease, practicing in Lake Charles, Louisiana. He was accepted by the trial court as an expert in the field of orthopedic surgery.
Dr. Noble was an orthopedic resident at the time of Shametha’s surgery, working under the attending physician, Dr. Zembo. He had worked with Dr. Zembo previously, and found it to be a comfortable operating environment. He participated in hundreds of surgeries as a resident and during the three months of his internship when he served in an orthopedic rotation. Six weeks prior to the surgery, he had written an article on this type of procedure. In preparing for the surgery, he reviewed articles and a textbook on the insertion of blade plates, which is a difficult operation. He explained the surgery to the jury using a model provided by the plaintiffs’ counsel. His description essentially followed that given by Dr. Zembo. He noted that the model did not show the nerves and blood vessels closely enclosed to the back of the thigh bone. During the surgery, the surgeons cannot see the side of the bone where the vessels are located. When asked whether puncturing or lacerating the periosteum, and completely transec-tioning both the popliteal artery and vein with a sharp instrument is a risk of the procedure, he replied:
Any time that we have a structure that is very close to where we are working certainly there’s a risk that occurs and unfortunately it occurred in this situation. One of the things that’s not been brought up yet is that while we are doing this, it’s very difficult to see. We don’t see the vascular structures that *446 are being protected by the retractors. .We are operating through a window from the side of the thigh bone. We know where they are because we know they are behind the periosteum but we don’t actually see them. We don’t see them during the normal course of the operation.
|13He described the difference between a known risk of a procedure and a mistake by use of an example suggested by plaintiffs’ counsel. If a nurse were to drop a scalpel accidentally and it fell and transected. the popliteal artery and vein, that would not be a known risk of the procedure, but would be the nurse’s mistake. He could not, however, make a factual distinction between the nurse’s dropping the scalpel and a doctor’s slipping in his use of a chisel.
He described a complication as implying an untoward effect of, in this context, an operation. Most orthopedists would feel that an example of .complication would be infection, failure to heal, and vascular or neurologic injuries occurring during the course of surgery, such as the injury to Shametha in this case. He expressed his opinion that her surgeons did not violate the standard of care, having used retrac-tors and prudence in the conduct of the operation.
Dr. Noble testified that he did not know the cause of the transections, because had he and Dr. Zembo known the cause, they would have known when it occurred and immediately would have summoned Dr. Hill or whoever was available. As it was, he and Dr. Zembo did not know of the transection until the tourniquet was let down. He testified that he has thought often about this case over the past twelve years and has not been able to identify the cause of the injury. He opined that the cause was a surgical complication rather than physician error.
Dr. Noble confirmed Dr. Zembo’s testimony that there are no established maximum time limits for use of a tourniquet, while noting that letting down a tourniquet at two hours is based more on custom than science. He testified that he read an article stating that at four hours reversible changes develop, that is, changes that would reverse themselves once the tissue received blood flow. At six hours, l^five percent of the cells show some damage, and at eight hours, widespread damage would occur. He testified that he believed that at two hours into Shametha’s surgery the surgeons thought they were almost done, “and then before you know it the cumulative of three hours occurred.” He concluded that Shametha’s leg ultimately died and had to be amputated because of a lack of sustained blood flow. This condition was caused by the combination of the injury to the vessels and the surgeons’ failure subsequently to reestablish blood flow.
Dr. Noble noted that the tourniquet was placed high on the patient’s thigh, and if the tourniquet had caused the death of her lower leg, it would also have caused problems with her upper leg, below the tourniquet. Since this was not the case, he did not believe the length of time the tourniquet was applied was causative to the ultimate loss of the leg.
According to Dr. Noble, the doctors anticipated performing an osteotomy that would correct the deformity and stabilize it for healing. The orthopedic procedure had been completed when Dr. Hill made the first vascular repair. When Dr. Hill had made his repair, Dr. Zembo and Dr. Noble proceeded to close, all the while monitoring the blood flow tactilly with their fingers and with an ultrasound monitor. Near the end of the closing procedure, about thirty minutes after Dr. Hill had finished, the surgeons noticed that *447 there was an occlusion, as they could no longer hear or feel the signal of the vessel. They called Dr. Hill, who came back quickly. The surgeons reopened the incision, and a clot that was blocking the vessel was removed.
The orthopedic surgeons performed a fasciotomy after the second repair[10]. In this case the fasciotomy probably was performed then because there is a higher likelihood of reperfusion injury after the second vessel repair, but Dr. Noble testified that he did not take part in the decision, which possibly was made by Dr. Zem-bo and Dr. Hill. Dr. Noble testified that if he had a vascular problem during surgery, he would rely on general surgeons.
The pulse again was lost, and Dr. Hill performed an angiogram and re-explored the area. According to Dr. Noble’s best recollection, Dr. Hill then performed another repair using a fluoroseope to help visualize the area. After this third repair, a pulse was reestablished.
Dr. Noble was questioned concerning the accuracy of his written report of the operation. He noted that he used a standard recitation of the surgical procedure, adding the fact that the popliteal artery and vein were cut. The report also mentions the vessel damage complication when it notes, “a tourniquet was deflated and at that moment a large amount of blood was noted to emanate from the region of the popliteal fossa. Digital exploration revealed a one centimeter laceration within it.” Later, the report mentions the posterior dissection, Dr. Hill’s notification, and his entry to the operating room to provide assistance. These notes, according to Dr. Noble, reflected accurately what happened in the operating room. Dr. Noble pointed out some minor errors in the report: (1) the date of the surgery was May 10, not May 9; (2) the incision was probably more like 25 than_[^15 centimeters; and (3) they perforated the medial femoral cortex rather than the lateral femoral cortex.
Dr. Noble testified that he was unaware that Mrs. Douglas was trying to see him concerning her daughter’s condition, and confirmed that the attending surgeon, Dr. Zembo, would be the appropriate person to advise Mrs. Douglas. He recalled having seen Shametha during his rounds and reporting on her status; however, he did not think that he ever said she would be going back into surgery or would need more surgeries.
Dr. Joseph Isaacson of Beverly Hills, California, testified for the plaintiffs as a board certified expert orthopedist who performs this type of surgery on children. He is a clinical assistant professor at the University of Southern California and serves as vice chairman of the Cedars-Sinai Hospital’s orthopedics department. He was accepted as an expert in the field of orthopedic surgery. During the course of his examination on qualifications, he testified that although he has never severed the popliteal artery in a distal femoral osteotomy, he severed an artery when doing an open reduction of a patient’s proximal radius fracture. At that time, he called the pediatric general surgeon to make the necessary repair and, according to Dr. Isaacson, “All went well.” He professed no expertise in the fields of vascular surgery or pediatric surgery.
He opined that an aberrant chisel that gets past the retractor through the perios- *448 teum to sever the vein and the artery would be below the applicable standard of medical care. He testified that while this is a risk of the procedure, this does not mean it is within the standard of care. He was unable to think of an exception where it would be acceptable.
| aJPr. Isaacson agreed with Dr. Noble’s testimony that the practice pattern is to keep the tourniquet on for about two hours. He aims for ninety minutes and accepts two hours, becoming nervous at anything over two hours and most orthopedic surgeons do not go to three. He opined that the extremity can be saved with lacerations that completely disrupt blood supply for up to eight hours. Therefore, at three hours with a clean cut that appears to be repairable, he would anticipate the leg was then salvageable. He testified that a chisel might be hammered in the direction of blood vessels if they were protected by a retractor. In such a case, he would do everything he could to avoid the outcome that occurred in this case. He did not believe it was possible to transect the popliteal artery and vein in the manner described absent a breach of the standard of care. He testified that there was no other plausible explanation other than a breach of the standard.
On cross-examination, Dr. Isaacson testified that in the case of his own experience in severing an artery, his action violated the standard of care. He acknowledged that Dr. Zembo and Dr. Noble took responsibility for their actions and acted appropriately when they noticed bleeding and called Dr. Hill. He also acknowledged that there was nothing inappropriate or improper in having a fourth year resident participate in the procedure.
Alan Greenwald, M.D., a clinical instructor in the University of California, San Francisco School of Medicine, Department of Orthopedic Surgery, testified by videotaped deposition taken in March of 2005. Dr. Greenwald, a board certified orthopedic surgeon, testified for the plaintiffs. He has been qualified in court as an expert in orthopedics on behalf of both plaintiffs and defendants, and has never been denied qualification. He testified that he has not published any studies in the field of femoral distal osteotomies on a patient under the age of eighteen; however, j^he routinely has performed surgeries similar to that which is the subject of this litigation.
Dr. Greenwald described the operation to correct knock-knee, and testified that if the retractors are in the proper position during the bone-cutting procedure, the po-pliteal artery and vein cannot be cut. The retractors would protect the other structures from anything sharp. He opined that the transections of the vessels indicate that the orthopedic surgeons breached the standard of care. The clean cuts noted in the report of the operation indicate that the vessels were cut by a sharp object such as a saw, knife, osteotome, chisel or similar object. Dr. Greenwald opined that the time it took for the orthopedic surgery, approximately three hours, did not constitute a breach of the standard of care; however, the failure to let down the tourniquet after two and a half hours would constitute such a breach. The reason for this opinion is that nerve tissue is particularly sensitive to lack of oxygen, and all cells start to die if deprived of oxygen for more than three hours. Dr. Greenwald found no reason in the operation notes why the tourniquet could not have been let down at two and a half hours to allow blood to flow through the leg and reoxy-genate the tissues.
Dr. Greenwald testified that the actions of Dr. Zembo and Dr. Noble upon taking down the tourniquet and noticing bleeding were appropriate, and that it was within *449 the standard of care to call in a vascular surgeon or a general-surgeon to repair the damage to the vessels.
Dr. Greenwald on cross-examination agreed that injury to a vessel is an understandable complication of this surgery, but is not considered to be common or a regular complication. He affirmed that it is below the standard of care to cut these vessels, and that the risk of the procedure does not encompass medical error.
| ^Vincent Deeney, M.D., an expert in orthopedic surgery, testified by deposition on behalf of the orthopedic surgeons. Dr. Deeney worked at Ochsner Clinic in New Orleans as recently as September of 1999, and was familiar with the standard of care applicable to physicians in that area at the time Shametha’s surgery was performed. He stated that under the circumstances that this patient presented, he would have performed the same surgery to correct her knock-knee condition. In his opinion, “under the best of circumstances”, there will be times when certain complications will occur, including injury to the associated nerves and blood vessels. From the operative report, up to the time the vessels were transected, it appeared to be a standard operation with a good result from the orthopedic procedure. He testified that he had not seen any material or information that would lead him to believe that Doctors Zembo and Noble deviated from the proper standard of care. He admitted that in this type of surgery, a surgeon could make an error of judgment in assessing where to place the retractor tools to protect the nerves and blood vessels. While he testified that the fact that a transection of the blood vessels occurred means the vessels were not protected, he opined that this does not mean that the retractors were improperly placed or the chisel was improperly used.
Defendant Charles Hill, M.D., testified in his defense. After having been board certified as a general surgeon, he received board certification as a pediatric surgeon. He testified that he performed vascular surgery only in emergency situations, in the instant case and one other involving a six year old patient who arrived at the hospital with a gunshot injury to the neck and a cord transection. The gunshot case occurred many years prior to Shametha’s surgery.
li.fiWhen he received the call to CH, he was at home, and was told only that his help was needed in the operating room. When he arrived, the surgeons told him that when they let down the tourniquet there was a rush of blood and they needed help in finding the cause. Initially when he viewed the patient, he could not determine if the blood was venous or arterial, the environment was controlled and the surgeons did not appear to be excessively nervous or upset. He and they tried unsuccessfully to determine visually the source of the bleeding, so he asked them to release the tourniquet briefly to determine the source and character of the blood. The blood came swiftly and clearly was arterial.
Dr. Hill admitted that he did not indicate to either Dr. Zembo or Dr. Noble that vascular surgery was outside of his experience. It was clear they were having a problem and he was not aware of any vascular surgeon who was available. No one on CH’s staff performed peripheral vascular surgery at any time. Although it would have been possible to transfer Shametha to another hospital, that would have required a considerable amount of time and unquestionably would have jeopardized her. It would also have taken a fair amount of time to identify and locate a specialist and then have him or her brought to CH from another location and *450 obtain temporary privileges for that person to perform the surgery at CH. None of these alternatives seemed viable at the time.
Dr. Hill was unsure if he was aware that the tourniquet had been in place for approximately three and three-quarters hours when he arrived in the operating room, and was not sure whether an anesthesiologist or nurse anesthetist was present. It would have been the responsibility of those individuals to keep the surgeons aware of the length of tourniquet time. He testified that he probably became aware fairly early of the time, since that is in the nature of the procedure. |a7Since the procedure had been going on since the morning, and had been going on under a tourniquet, and now there was a vascular injury, he testified that he would have known without asking that it had been awhile since the tourniquet had been engaged.
When Dr. Hill arrived, he released the tourniquet for seconds, only long enough to find the general location of the bleeding. After dissecting some of the leg tissue to locate the vessels he discovered that both the popliteal artery and vein had been completely transected. He testified that it took about forty-seven minutes, from 12:25 to 1:12 p.m., for him to identify the source of the bleeding. His view of the two blood vessels was consistent with Dr. Zembo’s statement that a sharp instrument got past the retractors, went through the perioste-um and cut the vessels. The blood vessels themselves appeared to be healthy. He presumed that the vessels had been cut in the same area of the cut in the periosteum; however, he was unable to be certain since, once the vessels were cut, they separate like a rubber band that is cut. He found them in an area remote from the perioste-um cut, but presumed they came from that area.
Dr. Hill was asked whether, once he determined the source of the bleeding, he knew that the operation was approaching four hours in the tourniquet. He testified that he was not sure he consciously went through that process; however, as time passed it would be clear that the longer the operation continued, the more likely the limb would not survive. He testified that he could see no way, at that point in the surgery, that Shametha could be transferred or that another doctor could be brought to CH from a different hospital. CH had no one on staff who did peripheral vascular work, so he had to finish the procedure.
12sPr. Hill admitted that it did not occur to him to ask Dr. Zembo or Dr. Noble if they knew someone who could come in to assist him. He also admitted that he did not tell the surgeons that he had performed only one arterial repair since his 1977 board certification.
At 1:12 p.m., roughly four and a half hours into the operation, Dr. Hill had clamped the arteries and veins, and the tourniquet was released; however, there was still probably impaired blood flow to the lower leg. He testified that he would imagine the leg was receiving some flow through the thigh muscles, which would have been perfused by then; however, according to Dr. Hill, this would be an insufficient flow.
Dr. Hill explained that he did not use systemic Heparin, a clotting inhibitor, for the surgery because of his concern that there would be an issue of bleeding, considering the large open area, the amount of raw tissue, and the need to divide the muscles, bone, and periosteum, which he referred to as the trauma of the operation. He believed the use of systemic Heparin could cause the patient to bleed out while he was attempting the repair. He did not recall having discussed the systemic use of *451 Heparin with the orthopedic surgeons, and admitted that use of the drug would not have delayed his ability to begin working on the repairs. He admitted that non-flowing blood can clot, and that once he had isolated each end of the cut vessels, the clamps he put in place prevented the flow of blood from that point down. He considered the possibility that blood behind the upstream arterial clamp could form clots toward the heart during the repair process, and admitted that he did not administer any medication during the first repair that would have dissolved or prevented clot formation. He testified that he depended on the blood flow at the completion of the repair, when the end is opened, to “shoot out” any l^clots. He admitted that there probably is no objective way to determine whether all the clots had been flushed out of that upstream artery.
After the initial repair, he checked both with his finger and with a Doppler machine on the patient’s foot and found from the pulse that good blood flow had been re-established. He then left the operating room while the orthopedic surgeons closed the wound. He testified that it took him roughly forty minutes to repair the two vessels, so that the leg would have been without blood flow for at least five hours and ten minutes by the time he had completed the repair.
When asked if, when he left the operating room after the first repair, he felt confident that the leg was going to survive, he replied in the negative. He testified that he had never done the operation before, had never been in that setting, did not “know much” about tourniquets and tourniquet time, and did not know what to expect. He admitted to a considerable amount of fear that this “would not be fine.”
Approximately an hour later, Dr. Hill was called back to the operating room because the orthopedic surgeons were unable to detect a pulse in the patient’s lower leg. The operative reports did not indicate how long blood continued to flow through the repair or the strength of the flow. He returned to the surgery, and found that the repair had failed. They had to re-prepare the skin and reopen the wound and the arteries. He determined that there was a blockage around the first repair site caused by clotted blood. He clamped off the artery, again stopping blood flow to the lower leg. He removed the stitches from the ends of the arteries and cleaned out the clots distally down the leg and in the area of the original repair using a balloon catheter. After having cleaned out the clots, he reconnected the artery. They elected not to try to clean out the vein, which he thought had probably clotted as well, because he thought it would clot again. His focus was |angetting the blood to the leg, and then the blood would get out of the leg through other sources than just that popliteal vein. In •view of the prior clotting, he elected to use local Heparin in the blood vessels themselves. The Heparin injection would affect less than two inches of the artery. He did not use systemic Heparin because of his previously stated concerns that it would cause excessive bleeding. He was not aware at that time that Dr. Zembo did not believe that systemic Heparin was contraindicated. The second repair was begun at 4:15 p.m. and, according to Dr. Hill, was completed and the wound closed in about another hour. At about 5:15 p.m., blood was again flowing to the lower leg. At that point, blood flow had been compromised for about nine hours.
After the second repair, Dr. Hill and his associate, Dr. Lowe, remained in the operating room for about forty-five minutes, whereupon once again the artery became *452 clotted and there was no pulse in the lower leg. Dr. Hill reopened the leg and found more clotting where the artery had been sewn together. Dr. Hill believed the clots were forming in that area because the operation and tourniquet placement had slowed the blood flow, and the point of damage is a place for a clot to start. During this third repair procedure, Dr. Hill used systemic Heparin, placed a small catheter in the artery in the groin above the injury, and started infusing Urokinase to try to dissolve clots that might already be there. He considered the situation to be “desperate” and accepted the bleeding risk associated with these drugs. The third repair was completed roughly at 9:30 p.m. At that time, the patient’s leg had been without significant blood flow for about thirteen hours. He was not called back to do any further repairs to the artery.
Dr. Hill testified that he believed the systemic Heparin and the Urokinase certainly helped make the third repair succeed in restoring circulation. He did not | ^participate in any of the subsequent surgical procedures involved in stripping away .dead tissue from Shametha’s leg.
Dr. Hill testified that he did not know whether the standard of care for vascular surgery or general surgery at the time required use of systemic Heparin for all arterial reconstruction unless precluded by some other trauma. He testified that he did not recall the standard in place in 1976 when he received his general surgery board certification, and is not presently board' certified in general or vascular surgery. When asked if the standard of care applicable to board certified general surgeons applied to him, Dr. Hill replied, ‘Tes. I guess.” He admitted that he has not researched the standard before or after the surgery in question. He also admitted that systemic blood thinner was introduced during the third repair and after that time there were no further problems with occlusion of the repair.
Donald Akers, M.D., a board-certified general and vascular surgeon, testified on behalf of Dr. Hill. Dr. Akers opined that Dr. Hill was placed in an exceptionally difficult situation by reason of the emergency conditions at the time he was called. He did not consider Dr. Hill’s actions to have constituted a deviation from the standard of care, and testified that the child’s leg, more probably than not, was not salvageable by the time Dr. Hill arrived in the surgical suite. In his opinion, the fact that the artery clotted after the first repair indicated that collateral blood vessels supplying circulation had been lost, and there were significant issues with blood flow to the leg tissue. He explained that the branches of the blood system were occluded, so that there was no place for the blood to flow. He also noted that with the passage of time when the tourniquet was applied, the endothelium of the blood vessels suffered damage. The cells would not survive long term, vessels would go into spasm, and potassium and other products would | S2be released, making the vessels more thrombogenic and causing edema. The edema can increase venous and arterial pressure or resistance, making the blood more static and clotting more likely. He also testified that he generally would use systemic heparinization in this type of case, but noted that this is done on a case-by-case basis, considering the condition of the presenting patient and in consultation with the orthopedic surgeon.
Willis Wagner, M.D., of Los Angeles, California, testified for the plaintiffs as an expert in the fields of general and vascular surgery, but not in the use of tourniquets. In addition to teaching at Cedars-Sinai Hospital and serving as co-director of the hospital’s vascular trauma program, he has *453 published a number of articles including one on knee injuries causing popliteal artery injuries, and a chapter in Current Problems in Surgery on the management of popliteal artery injuries. His abstract on that issue was presented to the international meeting of the International Society of Cardiovascular Surgeons. He also published one of the earliest papers on the use of a tourniquet in vascular surgery. As a result of that paper, he was asked to write a book chapter on that subject in Advances in Vascular Surgery.
He reviewed the depositions of the defendants, Dr. Akers, and Dr. Deeney, and the CH records in preparation for his testimony. He also heard Dr. Hill’s trial testimony.
Dr. Wagner opined that at the point when Dr. Hill examined the wound and found that the popliteal artery and vein had been transected, Dr. Wagner absolutely believed it was more likely than not that Shametha could have been transferred to other facilities within a fifteen or twenty minute distance of CH. Had that been done, based on his study of more than two hundred nine patients with popliteal 1¡^artery injuries with eight to nine hours of impaired blood flow, it was more likely than not that Shametha’s leg would have survived. In this case, involving a clean slice with no other major soft tissue injury, there should have been a simple repair with a favorable outcome.
In Dr. Wagner’s opinion, the first repair failed because of inadequate blood thinning, because no regional or systemic blood thinners were used. He testified that this violates the care standards of general and vascular surgery. No vascular reconstruction, he opined, should be performed without blood thinners unless the patient has life threatening injuries that prevent their use. He explained the process to the jury, noting that a clot is the body’s natural defense system, and will form where there is inadequate blood flow. Dr. Wagner described the recurrent clotting at the site of the arterial repair as the “Achilles heel” of the operation. He found no reason in Shametha’s case precluding the use of a systemic blood thinner. Dr. Hill’s concern about excessive bleeding was not well-founded, according to Dr. Wagner, because such bleeding can be reversed instantaneously, within a matter of seconds, by injection of the drug Prota-mine. On cross-examination, he testified that the benefit of anticoagulation had been routine procedure for vascular reconstructions in the 1960s and, after publication of his article and book chapter in Blunt Popliteal Artery Repairs, became more appreciated during the 1970s and 1980s.
Dr. Wagner also noted that the applicable standard of care is that required for a particular procedure, and does not apply to the specialty of the person performing the procedure. Thus, for the repair involved, the standard of care would be the same whatever Dr. Hill’s specialty might have been. He testified, “If somebody elects to do an operation, they are bound by the standard of care for an | ^individual, a physician to [sic] doing that operation, and I don’t personally believe that what your background experience and what credentials you have on the wall make a difference. If you make the decision, the conscious, rational decision to undertake an operation, you have a duty to reach that standard of care.”
In concluding that Dr. Hill breached the standard of care for Shametha’s arterial repair, Dr. Wagner noted that Dr. Hill, a prominent member of the medical community, had options. He could have called a specialist from another hospital, or transferred the patient to another hospital. Dr. Wagner was sure that Dr. Hill was aware *454 of who does vascular surgery, and referred to New Orleans as having “some of the finest medical schools and medical institutions in the country.” He also opined that temporary surgical privileges are normally granted “on the spot” in case of an emergency. Dr. Wagner admitted on cross-examination that he had no specific knowledge of a physician who would have been available at the time of Shametha’s surgery. While he did not know for certain that there was a hospital and surgical team available to treat the patient within the time frame in which the leg could have been salvaged, he was aware of many fine local medical institutions including trauma units. He testified that he would be surprised if there were no trauma center or emergency room capable of taking care of this patient.
Dr. Wagner testified that in addition to breaching the applicable standard of care, Dr. Hill showed poor judgment in failing to use blood thinners for the repairs. In this situation, uncontrolled bleeding is unlikely, and the dissection to get to the artery is no different than the dissection done on a daily basis in elective operations. Dr. Wagner expressed his “very strong” belief that the failure of this vascular reconstruction that extended the period of time when there was not enough blood supply to the leg caused the ultimate loss of the leg due to the dead [¡^muscle from lack of circulation. He stated that had Dr. Hill used systemic anticoagulation during the first repair, “we wouldn’t be sitting here today.”
Dr. Wagner noted that when Heparin and Urokinase ultimately were given, the vascular reconstruction stayed open, but, unfortunately, by then it was too late. Dr. Wagner made clear that the standard of care regarding use of systemic anticoagulants was in effect in 1994 when Shame-tha’s surgery took place.
Dr. Wagner was questioned about the opinions expressed by Donald Akers, M.D., a defense expert. Dr. Wagner testified that he and Dr. Akers had published on similar issues many years ago, but he had not seen Dr. Akers’ name in recent publications. He has had no contact with Dr. Akers, who served as President of a medical society to which Dr. Wagner also belonged, in probably a decade. He disagreed with Dr. Akers’ opinions that (1) a different standard of care should be applied to Dr. Hill, for the reasons previously stated; and (2) that the use of systemic Heparin during the first repair would not have changed the outcome of Shametha’s case, based on the literature and the largest experience with popliteal artery trauma published in the United States. He agreed with Dr. Akers’ opinion that he would have used systemic Heparin in this case, but differed from Dr. Akers’ conclusion that it would be up to the discretion of the surgeon. Dr. Wagner testified that Dr. Akers agrees with him that giving systemic anticoagulation was a very important part of this patient’s operation.
Dr. Wagner disagreed with Dr. Akers’ opinion that there is a risk of compartment syndrome if systemic Heparin is used, and said he did not know the basis for or source of that opinion. Compartment syndrome occurs when swelling eventuates in tissue that confines where the muscle is in the leg. Leg muscle is surrounded by skin and by very firm tissue known as fascia which does not stretch. |3fiTherefore, if there is swelling or bleeding within this compartment in which the muscles are contained, pressure builds up and can increase the pressure on the blood supply to the nerves and muscle. In compartment syndrome, the muscle can die, which is why the surgeons in this case performed a fasciotomy to cut the fascia open, because the restored blood supply would cause the starved muscle to swell. Dr. Wagner *455 opined that there is no reason to believe that giving Heparin would have caused compartment syndrome. There was no trauma to the leg below the knee and no reason that Heparin would have accentuated Shametha’s propensity to develop a compartment syndrome.
Dr. Wagner was also questioned concerning the testimony of defense expert Vincent Deeney, M.D. Dr. Deeney gave essentially the same timeline as Dr. Wagner, that is, at four hours there are reversible changes, at six hours some cellular death, and, at eight hours, progressive and more severe muscular death. Therefore, according to Dr. Wagner, to say it was more likely than not that Shametha would have lost her leg after the first repair is inconsistent with his own belief and with Dr. Deeney’s deposition testimony. Dr. Wagner also opined that the suggestion that as soon as the two vessels were cut during the orthopedic surgery there was only a fifty percent chance that the leg would survive is inconsistent with his experience, the published literature, the common understanding of treatment of po-pliteal trauma, and Dr. Deeney’s prior deposition testimony.
On re-direct testimony, Dr. Wagner noted that two-thirds of his forensic consulting practice is done for doctors who are accused of medical malpractice, and about one-third for plaintiffs. He also has a very busy practice, working eighty-hour weeks. He testified that he accepts this burden on his practice because |S7he considers it an important function of the legal system that, painful as it is, “makes us better.”
John E. Clark, M.D., testified by videotaped deposition taken shortly before the trial. Dr. Clark identified himself as a rehabilitation physician, teaching physical medicine and rehabilitation, to which he referred as “physiatry.” He testified that he has also prepared “probably over a hundred” life care plans since the early 1990s. He defined a life care plan as a projection of an injured individual’s future medical and support care needs. He testified that he frequently has provided testimony in court wherein he gave opinions with respect to a life care plan. No court has refused to accept him as an expert either in the field of physiatry or long-term health care plans. He admitted that he is not a specialist and does not hold himself out to be a specialist in the fields of orthopedic surgery or vascular surgery.
Dr. Clark first saw Shametha on June 28, 2004, when he was asked to prepare a life care plan for her. In constructing the plan, he focused on certain of the patient’s health issues: (1) insulin-dependent diabetes, with the result that there are chronic skin and circulation problems in the feet and lower extremities making her prone to problems with healing and recurrent ulcerations on the stump of her leg; (2) below-the-knee amputation; (3) borderline mental retardation, with the result that she will not always be able to follow through with instructions.
He saw Shametha four times between the initial visit and the date of his deposition in May of 2006. Each time, she presented with a five centimeter ulcer on the stump over the level of tibial condyle and over the fibular head, that is, on the side of her knee. This has turned into a chronic ulcer.
| asThe second time he saw her, he placed her in physical therapy in Seventh Ward Hospital in her hometown of Hammond, Louisiana, for physical therapy, debridement and whirlpool. The ulcer healed at that time, but between visits it returned, as soon as she wore her prosthesis. The prosthesis causes friction just below the knee joint at the tibia! plateau, where ulcerations result from the pressure of the prosthesis against the skin. Shametha’s *456 situation is complicated by a very short below-knee amputation, so there is very little purchase surface to stick into the prosthesis’ socket. Also, the skin, fat and soft tissue around the stump are very atrophied, resulting in very little cushioning in the soft tissue between the tibia and her skin surface. Finally, her distal tibia stump has ossified, meaning that bone in the soft tissues, or some of the periosteum, has actually calcified. This can lead to a tendency to skin breakdown and ulcerations. Combining these factors with her diabetes results in recurrent ulcerations when Shametha wears the prosthesis. He opined that, more likely than not, Shame-tha will continue to develop ulcers on her stump. The fact that the ulcer has been present for almost two years puts Shame-tha at risk for developing an underlying bone infection, which would require intravenous antibiotics and probable debridement. He also concluded that Shametha needs a stump revision, because, in his opinion; her current below-knee amputation is not going to function for her. A good fit with the prosthesis cannot be achieved without developing skin breakdown. He recommends a knee disarticulation in which the leg is cut off at the knee joint. The distal femoral |a9condyles will then become the surface on which she supports herself when wearing the prosthesis.
Dr. Clark also noted that Shametha lacks full range of motion of her right knee, with an approximate fifteen degree extension lag. She cannot fully extend her stump and can flex to only ninety degrees. Shametha also has degenerated osteoarthritis in the medial compartment of the knee joint. These conditions also support his recommendation for a stump revision. He testified that he believed such an operation would cost between $10,000 and $30,000. Later in his testimony he estimated the cost at between $6,000 and $20,000.
Dr. Clark outlined Shametha’s life care needs. In obtaining the costs of the various elements, he contacted various vendors and also relied on his own experience. He testified that Shametha will need a wheelchair for community mobility until she can obtain an appropriate prosthesis. Because she is now an adult and has adapted to her injury, she has no psychological issues requiring treatment at present. His plan includes psychiatric evaluations and treatment on an as needed basis. Shametha will need annual orthopedic follow-up and physiatric follow-up two or three times a year. He testified that the initial orthopedic evaluation would cost $500, based on information he received from the Baton Rouge Bone and Joint Clinic, and followup visits would cost between $79 and $150. The initial physiatric visit is $229, and each follow-up visit costs $106. Because Shametha needs to be taught to use her prosthesis, she will require outpatient physical therapy intervention. In addition, she will need an annual | ^evaluation of her stump and prosthesis. Each time she gets a new prosthesis, which he estimated will be every three years, she will require rounds of outpatient physical therapy to teach her to use the new device. He concluded this will require six to ten physical therapy visits for the balance of her life. Based on figures obtained from Capitol City Physical Therapy, the average cost of these visits is $120 to $150. He obtained the cost of MRI and X-ray studies of the knee from Baton Rouge Radiology. The cost of each prosthesis is between $10,000 and $12,000, figures Dr. Clark obtained from the local vendor, Hanger Prosthetics and Orthotics.
Shametha will also need an average of four stump socks per year and axillary crutches every seven years. Her manual *457 wheelchair and wheelchair cushion will have to be replaced about every five years. This may change, however, if she has the stump revision and ultimately is able to wear a prosthesis. He obtained a price of $1,500 for the wheelchair, $50 for the crutches, and $125 to $150 for the cushion, from a local provider, whom he could not identify.
Dr. Clark characterized his plan as conservative, since it did not include possible problems with infection and poor blood supply. Dr. Clark testified that he had researched the costs of the various elements of the plan; however, his deposition in the appellate record does not include that information.[11]
On cross-examination, Dr. Clark admitted that had Shametha complied with her appointment schedule and not failed to appear for four appointments during the |41two years he has been treating her, she would have had a better outcome in the treatment of her ulcers. He testified that he could attribute some of her current condition to the fact that she missed those four visits. He also admitted that the issue of stump revision is an orthopedic decision, and he has not referred Shame-tha to an orthopedist or arranged an orthopedic consult on her treatment.
On further cross-examination, Dr. Clark testified that he received a referral from plaintiffs’ counsel to develop a life care plan for Shametha and subsequently learned that he was to be her treating physician. He testified that Shametha appears to have adjusted to her injury as a child and accommodated to her injury from a psychological standpoint. Every time he has seen her, she has been happy and has never appeared to be depressed.
The parties stipulated that the plaintiffs would not call their vocational rehabilitation or economic experts. They stipulated further that Louis Lapinski is an expert in the field of vocational rehabilitation. If called to testify, he would opine under oath that more likely than not there is no job available to Shametha given her physical disability and her vocational skills. Absent the loss of her leg, her annual earning capacity upon reaching the age of eighteen was $18,595.21.
The parties also stipulated that Greg Ellis is an expert in the field of economics. If called to testify, he would testify under oath that Shametha’s economic losses are as follows:
Past Lost Income $72,110.00
Past Lost Fringe Benefits 5,452.00
Total Past Economic Loss $ 77,571.00
Future Lost Income [12] $313,599.00
Future Lost Fringe Benefits 22,582.00
Future Medical Costs 268,449.00
Total Future Economic Loss $604,628.00
TOTAL ECONOMIC LOSS: $682,199.00
142The parties stipulated to the following medical expenses:
Children’s Hospital $102,366.54
North Oaks Medical Center 49,940.66
Dr. Joseph Delatte 7,495.00
Dr. Raul Reyes, M.D. 6,245.00
Dr. Robert McAfee/J.L. Fambrough 705.00
O & P Specialists [13] 61,243.91
Dr. Ashwin Sura, M.D. 500.00
Dr. John Clark, M.D. 824.00
Home Health Services by Carolyn Douglas 2,380.00
Other Medical Expenses 43,646.49
TOTAL MEDICAL EXPENSES: $275,347.10
The plaintiffs assign the following errors: (1) the dismissal on the State’s mo *458 tion for summary judgment of the plaintiffs’ constitutional challenge to La. R.S. 40:1299.39; (2) the judgment limiting the plaintiffs’ recovery to a single cap; (3) the dismissal of the jury’s awards to the plaintiff parents; (4) the judgment not casting Dr. Zembo and Dr. Noble for damages.
In their Fourth Supplemental Petition, the plaintiffs outlined the grounds for their constitutional challenge to the damages cap imposed by La. R.S. 40:1299.39 [14], alleging that the act violates the following rights and constitutional provisions:
1. Equal protection of the laws, guaranteed by Article V of the United States Constitution (USC);
1432. Due process, guaranteed by article XIV of the U.S.C.;
3. Due process, guaranteed by Article I, § 22 of the Louisiana Constitution of 1974CLC);
4. Adequate remedy guaranteed by Article I, § 22 of the LC;
5. Separation of powers mandate established by Article II, § 2 of the LC;
6. Article III, § 12(A)(3) and (7) of the LC as a “special law” that grants privileges and immunities and changes the method of collecting debts and enforcing judgments;
7. Article XII, § 10(A) of the LC because it provides sovereign immunity to the State for certain types of suits and liability — in particular, suits in contract and suits for injury to persons and property — by limiting the amount injured persons can recover on account of the State’s independent and/or vicarious liability.
The Louisiana Attorney General and the named defendants were served with a copy of that supplemental petition. • The State, in response to the supplemental petition, filed a motion for summary judgment on the constitutional challenge, relying on this Court’s decision in Ruiz v. Oniate, 00-2105 (La.App. 4 Cir. 12/27/01), 806 So.2d 81. In that case, La. R.S. 40:1299.39 was held to be constitutional, and this Court affirmed the trial court’s summary judgment entered without an evidentiary hearing.
It is significant that the only constitutional issue before this Court in this appeal is the narrow question of whether or not the trial court correctly granted the State’s motion for summary judgment dismissing the plaintiffs’ constitutional |44claim. The plaintiffs did not file a cross-motion seeking summary judgment declaring the statutory provision unconstitutional. Therefore, the only relief to which the plaintiff could be entitled with respect to its constitutional claim is an order remanding that claim to the trial court for an evidentiary hearing on the constitutional question, if any.
The trial court heard the State’s motion on July 17, 2007, approximately two months after the jury trial and verdict. The trial court heard argument of counsel and granted the State’s motion, dismissing the constitutional claim.
Appellate courts review summary judgments de novo, under the same criteria that govern the district court’s consideration of whether or not a summary judgment is appropriate. Suire v. Lafayette City-Parish Consol. Government, 04-1459, p. 11 (La.4/12/05), 907 So.2d 37, 48. The summary judgment procedure is designed *459 to secure the just, speedy, and inexpensive determination of every action and shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ. Proc. art. 966(A)(2) and (B). The burden of proof remains with the mover; however, if the mover will not bear the burden of proof at trial on the matter before the court on the motion, the mover’s burden requires him only to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. La.Code Civ. Proc. art. 966(C)(2). Thereafter, if the adverse party fails to produce factual 14ñsupport sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. Id. When the motion is made and supported as noted above, the adverse party may not rest on the allegations or denials of his pleadings, but his response, by affidavits, or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if otherwise appropriate, shall be rendered against him. La.Code Civ. Proc. art. 967(B).
The MLSSA provides in relevant part:
F. Notwithstanding any other provision of the law to the contrary, no judgment shall be rendered and no settlement or compromise shall be entered into for the injury ... of any patient in any action or claim for an alleged act of malpractice in excess of five hundred thousand dollars plus interest and costs, exclusive of future medical care and related benefits valued in excess of such five hundred thousand dollars....
The State correctly points out that Louisiana courts, including this Court, have uniformly upheld the MLSSA and the MMA against a variety of constitutional attacks.
The standard applicable to equal protection attacks was noted in Whitnell v. Silverman, 95-0112 (La.12/6/96), 686 So.2d 23, 27:
Article I, Section 3 of the 1974 Louisiana constitution necessitates that (1) A statute shall be repudiated completely if it classifies individuals by race or religious beliefs; (2) A statute’s enforcement shall be refused absent a showing that the classification has a reasonable basis when the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations; and (3) A statute shall be rejected when the law classifies on any other basis, and a 14fimember of the disadvantaged class shows that it does not suitably further any appropriate state interest.
We find nothing in the record of the instant case requiring a different resolution of the plaintiffs’ equal protection claim. The discussion of changes in the value of our currency and the desirability of adjustment of the cap to reflect those changes is addressed more appropriately to the legislature.
Article I, Section 22 of the Louisiana Constitution of 1974 provides:
All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.
Where access to the judicial process is not essential to the exercise of a fundamental constitutional right, the legis *460 lature is free to allocate access to the judicial machinery on any system or classification which is not arbitrary. The constitutional guarantee of access to courts and a remedy for injuries does not warrant a remedy for every single injury. Based on the historical background of the constitutional mandate of access, the Supreme Court has concluded that in adopting this constitutional article, the constitutional convention did not intend to limit the legislature’s ability to restrict causes of action or to bar the legislature from creating various areas of statutory immunity for suit. Whitnell, 686 So.2d at 31.
In Butler v. Flint-Goodrich Hosp. of Dillard University, 607 So.2d 517 (La.1992), the plaintiffs claimed that the cap provision of the MMA violated the constitutional mandate of equal protection[15], prohibition against arbitrary, |47capricious, or unreasonable discrimination because of physical condition[16], and guaranty of an adequate remedy, administered without partiality for injury to persons and property[17].
This Court found the cap constitutional again in LaMark v. NME Hospitals, Inc., 542 So.2d 753 (La.App. 4th Cir.1989), and the United States Fifth Circuit Court of Appeals inferred that the cap meets Louisiana’s constitutional requirements in Owen v. U.S., 935 F.2d 734 (5th Cir.1991), cert. denied, 502 U.S. 1031, 112 S.Ct. 870, 116 L.Ed.2d 775 (1992).
The Supreme Court in Williams v. State, Dept. of Health and Hospitals, 97-0055 (La.12/2/97), 703 So.2d 579, considered and rejected a claim that the MLSSA contravened the Louisiana constitutional proscription against sovereign immunity. The court held:
[T]he abrogation of sovereign immunity demands that governments be limited to the substantive defenses that are available to private party defendants similarly situated. Simply stated, the abrogation of sovereign immunity necessitates the application of the law of the land equally to the sovereign as the private litigant. Accordingly, we find plaintiffs’ constitutional attack misplaced, as the statute at issue is equally available to the sovereign [through the MLSSA] and the private litigant [through the MMA]; therefore, it does not contravene the proscription against sovereign immunity. Williams, 703 So.2d at 583.
The Supreme Court in Butler noted that the statute’s constitutionality was sustained against the equal protection attack in Williams v. Kushner, 524 So.2d 191 (La.App. 4th Cir.1988), amended and affd 549 So.2d 294 (La.1989), where this Court balanced the state’s interests against the discrimination and determined l^that the legislative classifications were not arbitrary, capricious, or unreasonable. The Supreme Court in Williams amended and affirmed the court of appeal opinion without a definitive holding on the constitutional issue, confirming the validity of the $400,000 cap on general damages from the PCF but pretermitting the question of limiting payment by an individual health care provider to $100,000. The Butler opinion concludes at page 523:
The Medical Malpractice Act does not affect fundamental rights[18]. Everett v. Goldman, 359 So.2d 1256 (La.1978).
*461 The statutory cap on medical malpractice judgments in excess of $500,000 distinguishes between classes of persons according to their physical condition. One group, those with injuries evaluated below $500,000, are fully compensated. The o.ther group of malpractice victims, those with damages above $500,000, are fully compensated only for their medical expenses and related benefits. The question is whether that discrimination is arbitrary, capricious and unreasonable. Sibley II[19].
As an offset to the Act’s $500,000 limitation, Louisiana now offers those most severely injured by medical malpractice three benefits: (1) greater likelihood that the offending physician or other health care provide has malpractice insurance; (2) greater assurance of collection from a solvent fund; and (3) payment of all medical care and related benefits. Compensation and full medical care for those grossly injured by medical malpractice are legitimate social interests, which are furthered by the malpractice legislation. The discrimination in the act against those with excessive injuries is accompanied by a quid pro quo: a reasonable alternative remedy has been provided. See Bazley. Since the legislature’s statutory solution to the medical malpractice problem furthers the state purpose of compensating victims, it is not constitutionally infirm.
Overall, the Louisiana Medical Malpractice Act represents a reasonable but imperfect balance between |4!)the rights of victims and those of health care providers. It does not violate the state or federal constitutions.
We find nothing in the record of the instant case that would justify our abandoning the Butler rationale. The plaintiffs’ arguments concerning filing fees and bond requirements imposed by the legislature do not rise to the level mandated by the Supreme Court in the foregoing jurisprudence, and are addressed more properly to the legislature.
Plaintiffs suggest that the Louisiana Supreme Court’s remand in Arrington v. Galen-Med, Inc., 06-2923 (La.2/2/07), 947 So.2d 719 would require the trial court to hold an evidentiary hearing on their constitutional claims and prohibit resolution of the issue by summary judgment. Our thorough examination of the Supreme Court disposition and of the facts of the underlying case dissuades us from accepting plaintiffs’ suggestion.
In Arrington v. ER Physicians Group, APMC, 04-1235 (La.App. 3 Cir. 9/27/06), 940 So.2d 777, the court of appeal held that the $500,000 cap under the MMA did not provide plaintiffs the adequate remedy guaranteed under the “access to the courts” provision of La. Const. Art. I, § 22. The Louisiana Supreme Court vacated the judgment of the court of appeal in Arrington v. Galen-Med, Inc., 06-2944 (La.2/2/07), 947 So.2d 724, holding:
[Plaintiffs filed a motion for summary judgment, seeking to have the trial court declare the limitation of liability provided in La. R.S. 40:1299.42(B) unconstitutional. In support, plaintiffs argued that the statute violated the separation of powers doctrine pursuant to La. Const. Art. II, §§ 1 and 2; due process pursuant to La. Const. Art. I, § 2; the state constitutional prohibition against special laws pursuant to La. Const. |5ftArt. Ill, § 12; and judicial power pursuant to La. Const. Art. V, § 16. Plaintiffs did not argue the statute violated La. Const. Art. I, § 22 [the sole basis on which the court of appeal found the statute uncon *462 stitutional], relating to access to courts. [Emphasis supplied]
Defendants ... filed motions for summary judgment. Among other things, they argued that La. R.S. 40:1299.42(B)’s limitation on recovery was constitutional.
The Supreme Court noted the well-established principle that litigants must raise constitutional challenges in the trial court rather than in the appellate courts, and that the challenge must be specially pleaded and the grounds for the claim particularized. Since the plaintiffs had not pleaded that the statute violated the mandate of access to the courts, the question was never “briefed or argued” before the district court, nor was that issue passed upon by the district court in its ruling denying the plaintiffs’ motion for summary judgment. Therefore, the Supreme Court vacated the appeals court judgment. Since the court of appeal did not consider the constitutional issues actually raised in the trial court, the Supreme. Court remanded to the court of appeal to consider those issues. See also, consolidated opinion in Arrington v. Galen-Med, Inc., 06-2923 (La.2/2/07), 947 So.2d 719.
Contrary to the suggestion made in plaintiffs’ brief, the Supreme Court ruling in Arrington does not indicate that summary judgment is inappropriate in the instant context. Neither does it require an evidentiary hearing. The court merely remanded the case to the court of appeal for a ruling on the trial court’s judgment, limited to those issues raised in that trial court. That the court of appeal, on its own initiative, remanded the case to the trial court “to allow plaintiffs an opportunity to particularize all grounds for their claim that La. R.S. 40:1299.42(B) is | ^unconstitutional in a proper amending and supplemental pleading and to afford the State, the Patient’s Compensation Fund Oversight Board, and all parties in interest an opportunity to fully address and litigate the grounds so alleged [citations omitted].... Accordingly, we elect on remand, ... to instruct the district court to re-examine all of the issues raised and to determine whether the statute is constitutional after permitting the parties to amend the pleadings, to conduct full discovery, to file additional motions and briefs, to introduce additional evidence, and to fully argue [sic] the issues advanced in all the pleadings pursuant to a contradictory hearing.” [Emphasis supplied]
In the instant case, the plaintiffs raised all the constitutional issues in the trial court that were raised before this Court. The Supreme Court’s remand to the court of appeal (not to the district court) in the-Arrington case was to allow the appellate court to consider the constitutional issues that had briefed and argued, but as to which evidence had not been offered or received, in the trial court. There is no suggestion in the Supreme Court’s remand that an evidentiary hearing is necessary or proper. The underlying rationale for the Supreme Court’s remand to the court of appeal in Arrington was that the court of appeal had rendered judgment on an issue neither raised, briefed, nor argued in the district court. In the instant case, all constitutional issues before this Court were so raised, briefed, and argued.
Plaintiffs suggest in their reply brief that the Supreme Court’s action denying a writ application in Oliver v. The Magnolia Clinic[20], 07-2299 (La.12/3/07), 969 52So.2d *463 614 is “devastating” to the State’s position. We disagree. The Supreme Court having given no reasons for its denial of the State’s writ, and the ruling of the Third Circuit not having been published, there is no reason to believe that the writ denial has any relevance to the instant case. See, M.J. Farms, Ltd. v. Exxon Mobil Corp., 07-2371, p. 9 (La.7/01/08), 998 So.2d 16, 24.
We find no factual or legal basis for the plaintiffs’ suggestion in their brief that the trial court’s summary judgment precludes judicial review of the statute’s constitutionality. The trial court’s judgment is consistent with the jurisprudence of the Louisiana Supreme Court and this Court. Adherence to jurisprudence constante does not imply a preclusion of judicial review. To the contrary, the deference of lower courts to the previously expressed formal opinions of higher courts is an established principle of the law of this state and of the United States. Our review of the record indicates that the plaintiffs did not proffer interrogatories, requests for admissions, deposition notices, or affidavits in opposition to the State’s motion for summary judgment. Plaintiffs cannot now complain that the trial court denied them the opportunity to present evidence in opposition to the motion.
Plaintiffs suggest that the State did not carry its burden of proving the constitutionality of the MLSSA. However, the Louisiana Supreme Court has uniformly held that the party claiming a statute is unconstitutional bears the burden of proof on that issue. In a recent pronouncement, In re State ex rel A. J., 09-0477, p. 11 at fn. 17 (La.12/1/09), 27 So.3d 247, 255 the Court noted:
|,»aStatutes are generally presumed to be constitutional and the party challenging the validity of the statute bears the burden of proving it is unconstitutional. State v. Fleury, 01-0871 (La.10/16/01), 799 So.2d 468, 472; State v. Brenner, 486 So.2d 101, 102 (La.1986); State v. Rones, 223 La. 839, 67 So.2d 99, 105 (1953).
As we stated in the Ruiz case, supra, the resolution of the issue of the statutory caps’ constitutionality is that the caps are constitutional. That resolution is applicable to the present case. Plaintiffs filed no documents raising a genuine issue of material fact in opposition to the State’s motion. Therefore, the summary judgment granted by the trial court was appropriate and is affirmed. La.Code Civ. Proc. art. 966.
The plaintiffs contend that the trial court erred in finding that their recovery is limited to a single medical malpractice cap. In making our determination, as noted in Williams v. O’Neill, 99-2575, 99-2576, and 99-2577, p. 8 (La.App. 4 Cir. 3/13/02), 813 So.2d 548, 555-56, we are faced with two significant and competing policy considerations. There is a vast body of jurisprudence supporting the proposition that the medical malpractice acts are in derogation of the general rights available to tort victims and grant advantages to certain classes of persons and, therefore, must be strictly construed. See, Kelty v. Brumfield, 93-1142, p. 9 (La.2/25/94), 633 So.2d 1210, 1216, and the cases collected therein. We must acknowledge, however, the fact that the legislature intended by its adoption of these acts to “impose significant limitations on the courts’ power and authority to adjudicate medical negligence cases, viz., (1) a comprehensive $500,000 cap on damages; ... and (2) mandated medical review before trial.” Id.
*464 The trial court found that Shametha suffered a single injury, the loss of her leg. The trial court noted in its reasons for judgment:
IfttThe jurisprudence is clear that when plaintiff suffers one injury, even if it is the result of more than one tort, plaintiff is entitled to recovery of only one statutory cap. In Turner v. Massiah, 94-2548 (La.6/16/95), 656 So.2d 636, the Louisiana Supreme Court found that two doctors’ failure to diagnose breast cancer did not result in the application of two caps. There was but one injury, breast cancer. The Court’s reasoning was as follows:
The damage here, Stage 2 breast cancer, cannot be apportioned between the two tortfeasors because the damage is not severable; it is indivisible. If the damage, or injury, could have been divided into two parts, one part caused by one defendant, and the other part caused by the other there would have been, in effect, two injuries. In that case, there having been two torts and two injuries, the question of two caps might have been present. In this case there were two torts but only one injury. [Citation omitted]
In the case at hand, plaintiff sustained one injury: the loss of her leg. All other damages are derivative of that injury. As such, in accordance with established case law, the injuries sustained by the plaintiff were the result of one injury and plaintiffs are entitled to recovery of only one statutory cap of $500,000....
Following its opinion in the Turner case, the Louisiana Supreme Court was faced with a case involving not only separate acts of negligence, but also separate and independent injuries. In Batson v. South Louisiana Medical Center, 99-0232 (La.11/19/99), 750 So.2d 949, the court rejected the sort of “but for” analysis that would attribute all injuries back to the initiating problem that led to the questioned medical treatment. In that case, the negligence of primary surgeons who failed to administer pre-operative antibiotics resulted in the patient’s infection and sepsis, nearly ten months of hospitalization, six months in an ICU, hearing loss, and loss of cognition. Negligence of plaintiffs orthopedic surgeons and physical therapists who did not order and provide proper range of motion exercises to the patient ^resulted in severe flexion cont-ractures. Negligence of ICU physicians and their nursing staff in failing properly to observe the patient’s skin for early signs of breakdown and to turn plaintiff appropriately resulted in decubitus ulcers. The independent negligence of each group of tortfeasors was clearly, directly, and causally related to separate and specific injuries to the plaintiff. Under those facts, the court found that the plaintiff could recover up to the statutory cap for each of the separate, specific injuries.
This Court applied the Batson standard in Hernandez v. Chalmette Medical Center, 01-0074, 03-1169, and 03-1456 (La.App. 4 Cir. 2/4/04), 869 So.2d 141, finding that the plaintiff developed necrosis because of the failure of the various defendants to diagnose timely and treat properly a dislocated hip. There was no evidence that the plaintiff suffered more than one injury, that being the necrosis, unlike the Batson plaintiff who suffered three separate injuries resulting from three separate acts of negligence.
Plaintiffs argue that the negligence of Dr. Zembo and Dr. Noble would not have caused Shametha to lose her leg. However, at the time Dr. Hill appeared, because the tourniquet had been up for more than five hours, there was already *465 damage to the artery and vein and damage to cells, nerves and muscles that could cause medical complications such as par-athesias or foot drop to the lower leg. This argument belies the fact that whatever damage to the lower leg was caused by the orthopedists, that damage was subsumed in the ultimate loss of the leg. There is no evidence that Shametha sustained parathesias or foot drop as a result of the orthopedic surgery. Even if there were evidence to support such a finding, it is impossible to cast the doctors for any amount to compensate Shametha for a par-athesias and foot drop of which she was unaware during the surgery and which |Sfiwere associated with a lower leg and foot that have been amputated. Based on such an analysis, the entire burden of the plaintiffs’ injury would be borne by Dr. Hill, a clearly unjust and illogical result. It is clear that Shametha unfortunately suffered one devastating and life-changing injury, the loss of her leg, a loss to which the jury found the negligence of her three surgeons contributed.
The plaintiffs contend that the trial court erroneously found that Mr. and Mrs. Douglas’ claims for loss of consortium and Mrs. Douglas’ claim for “bystander” emotional distress pursuant to Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990) were extinguished by her daughter’s primary claim. The trial court, in its reasons for judgment, relied on Coleman v. Deno, 99-2998 (La.App. 4 Cir. 11/6/02), 832 So.2d 1016. In that case, plaintiff was seen twice at a hospital emergency room and was transferred to another hospital. Ultimately, his arm developed compartment syndrome and was amputated. He settled his claims against the hospitals; the case was tried, and a jury returned a verdict of over $5,000,000 for lost wages and earning capacity and general damages. It also awarded plaintiffs minor son $1,000,000 for loss of consortium, which the trial court reduced to $10,000. This Court noted that an award for loss of consortium includes the loss of service, love and affection, society and companionship, support, overall contentment and happiness. Coleman, 99-2998 at p. 28, 832 So.2d at 1034, citing Vaccaro v. Sports & Imports, Inc., 539 So.2d 989 (La.App. 4th Cir.1989). In dismissing the son’s consortium claim, the Court held:
[T]he consortium claim of the plaintiffs son was extinguished by the quantum awarded the plaintiff.... [I]n Armand v. State, Dept. of Health and Human Resources, 97-2958 (La.App. 1 Cir. 2/23/99), 729 So.2d 1085, 1094-95, ... the First Circuit found that the cap includes any derivative claims that arise from the same act of malpractice. In Hollingsworth v. Bowers, 96-257 57(La.App. 3 Cir. 12/30/96), 690 So.2d 825, where the damages awarded a child injured during childbirth exceeded the medical cap, the mother’s derivative claim for loss of consortium was extinguished.
In the present case, the son’s loss of consortium claim is derivative of the claim of his father. The consortium award was extinguished because the quantum awarded the plaintiff exceeded the $500,000 cap. The original judgment of the trial court is affirmed as amended to delete the pro rata share for the son’s consortium claim under the LMMA’s $500,000 cap.
Coleman, 99-2998 at p. 28, 832 So.2d at 1034.
In Conerly v. State, 97-0871, p. 9 (La.7/8/98), 714 So.2d 709, 714, a case involving an infant’s death claim and parental survival action claims, the Louisiana Supreme Court conducted an extensive review of the legislative history of the MLSSA, noting:
*466 [T]he purpose of the MLSSA is two-fold. Primarily, the Act was passed to insure an adequate supply of physicians and other professionals providing health care services on behalf of the state (1) by prohibiting judgments based on an act of such a person’s malpractice in excess of $500,000, exclusive of medical expenses; and (2) by providing the state shall pay the judgments and costs of defense associated with such malpractice. Secondly, the Act was intended to protect the public fisc by limiting the potential liability of the state for malpractice committed by a covered “person” to $500,000.... Obviously, allowing two caps in the instant case would not protect the public fisc as sufficiently as a single cap would. As we stated in Sibley, the statute in effect limits the state’s vicarious liability because it prohibits “any judgment whatsoever ” based on the malpractice of covered health care providers in excess of the statutory limitation. Given the above discussion of the legislative history and purpose of the relevant statutory provisions, we find the legislature intended only one cap for both survival action and wrongful death claims. [Citations omitted; emphasis in the original]
|fiSThese decisions from the Louisiana Supreme Court and this Court are disposi-tive of Mr. and Mrs. Douglas’ consortium claims. The plaintiffs’ argument, relying on Kelty’s, strict construction rule, is contrary to the Louisiana Supreme Court’s clear statement in the later Conerly case. So long as Conerly remains controlling law, we are bound by its conclusion that consortium claims are extinguished to the extent that they exceed the single cap on damages arising out of a single injury.
Plaintiffs correctly note in brief that neither Coleman nor Conerly specifically addressed Lejeune claims and argue that the cap statute expressly applies to the patient’s claim for her own injuries and to wrongful death claims. The statute is silent, according to the plaintiffs, with respect to claims of third parties for their own injuries connected to an act of malpractice.
In 1991, the Louisiana legislature codified the Lejeune holding in La. Civ.Code art. 2315.6, which provides in relevant part:
A. The following persons who view an event causing injury to another person, ... may recover damages for mental anguish or -emotional distress that they suffer as a result of the other person’s injury:
[[Image here]]
(2) The ... mother of the injured person, ....
Plaintiffs point out that La. R.S. 13:5106(B)(1), the state damages cap of general application, provides that the total liability of the state and its political subdivisions for all personal injury damages to one person, “including all claims and derivative claims”, with certain exclusions, shall not exceed $500,000. [Emphasis supplied] They argue that the absence of the derivative claims language in the MLSSA should, under Kelty’s, strict construction rúle, eliminate derivative |fi9claims from the MLSSA statutory cap. We accept as reasonable plaintiffs’ characterization of Mrs. Douglas’ Lejeune claim as derivative of her daughter’s medical malpractice claim; however, as a derivative claim, it is extinguished under the plain language of this Court’s opinion in Coleman as to which we are bound.
The plaintiffs would have this Court apply a separate cap to the patient and to her mother, essentially imposing a “per plaintiff’ cap. We find nothing in the legislative history of the MLSSA, in the statute itself, or in the relevant jurisprudence *467 to support such action. The analysis contained in Todd v. Sauls, 647 So.2d 1366, 1381-82 (La.App. 3rd Cir.1994) is applicable:
To construe the act to mean that the cap is per plaintiff is to misread the act. The act clearly states: “the total amount recoverable for all malpractice claims ... a patient” (emphasis added.) We emphasize the words “total,” “all claims,” and “a patient.” This is clear, unambiguous language. The clear quantifiers are “a patient” as well as “total amount recoverable” and “all malpractice claims.” Whether there is one or eight plaintiffs is of no moment. The physician’s negligence is not multiplied by the number of plaintiffs. In the case sub judice, the cap is applied per patient, not per plaintiff. This rationale is no different than applying insurance limitations in nonstatutory cap cases. The only difference is that in a medical malpractice action, the legislature imposed the cap for policy reasons; in the private sector, an individual contracts with an insurance company and the contract is controlling as to the limits of liability, not the number of plaintiffs.
When we examine the various statements of the Louisiana Supreme Court on the purpose of Louisiana’s medical malpractice cap, we find that if we applied multiple caps as espoused by the Todds, we would interfere with the special scheme of compensation crafted by the Louisiana Legislature and upset the soundness of providing a solvent fund which the Legislature sought to insure for the citizens of this State in the enactment of this legislation. Further, it would also be a misinterpretation of the clear wording of the act. Accordingly, we find that a single $500,000 cap applies collectively to those claims which flow from Mr. Todd’s |nndeath to Mrs. Todd and her major children because of Dr. Sauls’ act of medical malpractice. [Citations omitted; emphasis in the original]
In Bolden v. Dunaway[21], 97-1425 (La.App. 1 Cir. 12/28/98), 727 So.2d 597, the main issue was whether the MMA or general intentional tort law applied to the plaintiffs’ claim. The patient’s husband sought to have his claim for damages for emotional distress, damage within the purview of Lejeune and La. Civ.Code art. 2315.6, considered as outside the ambit of the MMA’s medical review panel requirement. The court held that the fact that the husband is a non-patient is not the decisive factor. “All claims against health care providers for malpractice must first go through the Medical Malpractice Act procedure, regardless of whether the claimant is a patient or non-patient.” As a corollary, the non-patient husband’s claim would come within the single statutory cap for damages sustained as a result of the patient’s care.
We are compelled to reject the suggestion that the statutory cap is to be applied “per plaintiff’ rather than “per patient.” Therefore, we find no error in the trial court’s deletion of the jury’s awards of loss of consortium damages to Mr. and Mrs. Douglas, and of Lejeune damages to Mrs. Douglas.
The trial court rendered judgment “in favor of Shametha Douglas and against the State of Louisiana.” Plaintiffs contend that the trial court erred in casting only the State, and not also Doctors Zembo and Noble, in judgment. The trial court’s reasons for judgment are silent on this issue; however, the State cites Detillier v. Kenner Regional Medical Center, 03-3259 (La.7/6/04), 877 So.2d 100 in support of the *468 judgment. ■ After having referred to the legislative intent behind the MLSSA, as noted previously in this opinion, the Supreme Court held:
| fi1 Although we hold that a plaintiff may name as a defendant an individual state health care provider covered under the Public Act [ the. MLSSA], a judgment entered against an individual state health care provider in favor of a successful medical malpractice claimant would be inharmonious with the express language of the MLSSA. If it were otherwise, state health care providers would not be protected by the very act which was specifically intended to protect them from liability from judgments. The language of the MLSSA clearly provides that it is the state alone from whom a successful claimant may recover damages or loss for the medical malpractice of a covered state health care provider. Moreover, the legislative aim of ensuring an adequately [sic] supply of state health care professionals would be frustrated if judgments were entered against state health care providers. The essence of the MLSSA is that a person qualified or covered under the Public Act is insulated from being cast in judgment. As was stated in it!mz[22], “the entire purpose of the MLSSA was to entice professionals to provide health care to patients on behalf of the state by protecting them against malpractice judgments.”
... [I]f judgments are entered casting both the state and the individual state health care provider as liable for damages, the covered worker would suffer real harm even though it is the state who would ultimately indemnify the state health care provider.... To allow the physicians to be cast in judgment ■jointly with the State renders the protection afforded by the act to be meaningless. It is no consolation to declare that they suffer no harm because they will be indemnified by the State. The recordation of the judgment will place a judicial mortgage on all of their real property ... [t]hey would be unable to purchase any real property, as the judgment would prevent a lender from financing the purchase ... [t]heir salaries could be garnished and their other assets seized.
Since the assets of the State are exempt from seizure, and should the State delay in satisfying the judgment for fiscal or other reasons, there would be nothing to prevent the judgment holder from proceeding to execute his judgment against all of the assets of the physicians that are not exempt from seizure.
|fi2The intent to protect them from malpractice judgments in order to entice health care providers to work for the state, would be frustrated.
Thus, we hold that in a medical malpractice suit brought against the state and a qualified state health care provider, if the court finds the state health care provider committed medical malpractice, judgment must be entered for the successful claimant against the state alone. [Citations omitted; emphasis in the original]
Detillier at pp. 15-16, 877 So.2d at 110-111.
Plaintiffs argue in brief that “[a]t footnote 12 of its opinion, the Detillier Court expressly noted that a 2003 amendment to the [MLSSA] casts doubt on its holding that only the State may be cast in judgment.” Pretermitting whether the 2003 amendment is to be given retroactive effect to this 1995 case, we find that it is not *469 authority for the suggested result. Footnote 12 states:
We note that a recent amendment to LSA-R.S. 40:1299.39.1(I)(3)(b) and (4)(b) appears to be inconsistent with the legislative scheme of the MLSSA and our holding today. Acts 2003, No. 1263 amended these subsections to provide for payment by the state “or person covered by this Part” to reimburse a successful claimant for the cost of obtaining the cash or surety bond posted by the claimant for the state medical review panel. The provisions of these subsections are not directly before the Court, therefore, we decline to render an opinion as to whether they violate the statutory scheme of the MLSSA. [Emphasis supplied]
As stated by the Supreme Court in the cited footnote, the amendment refers to reimbursement of the cost of the bond securing costs of the medical review panel, and not to the judgments rendered by the courts of this state on the merits of malpractice claims. The amendment provides only that the state and the state health care providers are to reimburse the cost of the medical review panel bond to a claimant who is successful before the panel by a unanimous decision of the panel | ^members.[23] Not only does the amendment fail to suggest that the individual health care providers should be cast in judgment on the merits, it is inapplicable to the instant case, where the panel found unanimously in favor of the doctors and against the plaintiffs. The Supreme Court’s footnote appears to cast doubt on the legitimacy of the amendment, by suggesting that it may be inconsistent with the stated purposes of the MLSSA. In any event, it does not support the position of the plaintiffs in the instant case.
For the foregoing reasons, we find no merit to the plaintiffs’ assignments of error.
The State assigns the following errors: (1) the trial court did not give it credit for Dr. Hill’s settlement; (2) it was cast in judgment for an amount greater than its proportionate share of the amount recoverable by the plaintiffs; and (3) the jury’s apportionment of fault to Dr. Zembo and Dr. Noble was manifestly erroneous.
As noted above, plaintiffs sued two state health care providers, Doctors Zembo and Noble, as well as a private physician, Dr. Hill. Dr. Hill and his malpractice insurer settled plaintiffs’ claims during the course of the trial. The State continued its defense of its physicians, and the jury found that Dr. Hill’s fault caused forty percent of the plaintiffs’ damages. Relying on the Louisiana Supreme Court’s decision in Miller v. LAMMICO, 07-1352 (La.1/16/08), 973 So.2d 693, the trial court cast the State for the entire statutory limit of $500,000, and the medical expenses found by the jury and applied the percentages of fault found by the jury to the total amount of damages found by the jury, prior to imposition of the statutory cap.
|MIn Hall v. Brookshire Bros., Ltd., 02-2404 (La.6/27/03), 848 So.2d 559, the court held that apportionment of liability under Louisiana’s scheme of comparative fault requires allocation of fault based on the total damages recoverable, not the amount recoverable under the MMA cap. In that case, the plaintiff was found to have been comparatively negligent. The Miller court extended the Hall result to cases in which *470 the plaintiffs were not found to have been at fault.
The State contends that because the defendants in Miller were private physicians, qualified under the MMA rather than the MLSSA, a different result should prevail. Furthermore, the plaintiff in Miller had not reserved rights against any liable or potentially liable party or parties, and all claims against all defendants had been settled or litigated to conclusion. In the instant case, the plaintiffs had settled their claims against Dr. Hill, reserving their rights against the PCF and the orthopedists.
We find nothing in the MLSSA that would support a different result from that obtained in Miller. Application of fault percentages against the entire jury award is consistent with the general rule of comparative fault requiring courts to calculate damages in such a manner that each tortfeasor pays only for that portion of the damage he has caused. La. Civil Code art. 2323; Miller v. LAMMICO, 07-1352, p. 9, 973 So.2d at 700. In both Hall and Miller, the Court noted that the damages sustained by a medical malpractice victim are distinct from the amount that can be recovered for those damages. Thus, the proper application of La. Civ. Code art. 2323 requires calculation of the damages owed and allocation of comparative fault before reduction of the damages award in accordance with the statutory framework of the relevant malpractice act. Similarly, this Court, in 65 Flemings v. State of Louisiana, 07-1290, p. 18 (La.App. 4 Cir. 8/26/09), 19 So.3d 1220, 1232, a suit brought under the MLSSA, applied the percentages of fault to pre-cap damages, citing Hall.
The State contends that pursuant to La. R.S. 40:1299.39(0 and Thomas v. Insurance Corp. of America, 633 So.2d 136 (La.1994), the State should be given credit for Dr. Hill’s settlement, which, it contends was $125,000[24]. We have examined the cited statute and find no authority therein for the State’s position. In the Thomas case, brought under the MMA private act, it was the PCF, not the State, that sought application of credits where plaintiff settled with more than one health care provider. The issue in that case was application of credit or credits where plaintiffs had settled for $100,000 with the first provider and for $40,000 with the second. The Supreme Court noted that under the MMA, the PCF was allowed a credit for each settlement between the plaintiff and the providers and/or their insurers. It held that, in the case of multiple settlements, a single settlement between a defendant and/or his insurer and the plaintiff for a sum of $100,000, or less than $100,000, but more than any other of multiple settlements, shall reduce by $100,000 any judgment in favor of the plaintiff to be paid by the PCF. Each other settlement shall reduce the amount due by the Fund by the amount of that settlement. We do not find that case to be apposite to the State’s claim, as standing in for the orthopedic surgeons, in the instant case, and find no authority for the $125,000 credit the State seeks.
66 The State seeks a reduction of forty percent of the award of past medical expenses to reflect the jury’s allocation of fault. As this Court noted in Flemings v. State of Louisiana, 07-1290 at p. 11, fn. 3, 19 So.3d at 1228, fn. 3:
The jury and the judgment awarded $30,000 in past medical expenses. Un *471 der La. R.S. 40:1299.39(F) this amount is in addition to the statutory cap of $500,000.
Because the judgment does not apply the fault apportionment to the award of past medical expenses, which are not covered by the statutory cap, the judgment is amended to conform to the jury’s allocation of sixty percent fault to the orthopedic surgeons.
The State contends that the jury’s finding that the orthopedic surgeons were sixty percent at fault (forty percent to Dr. Zembo and twenty percent to Dr. Noble) is manifestly erroneous and not supported by the record.
Determinations of the requisite level of skill required of a physician, of whether or not there has been a breach of the applicable standard of care, and of causation of the patient’s injury, are findings of fact and should be reversed only upon a finding of manifest error. The appellate court may reverse a judgment based on a jury verdict only if (1) the record reflects no reasonable factual basis for the jury’s finding, and (2) the record establishes that the finding is clearly wrong. Serigne v. Ivker, 00-0758, p. 5 (La.App. 4 Cir. 1/23/02), 808 So.2d 783, 787; Giammanchere v. Ernst, 96-2458, pp. 4-5 (La.App. 4 Cir. 5/19/99), 742 So.2d 572, 575. Under our manifest error standard of review, it is well settled that where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact made by the jury should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact lCTfinders choice between them cannot be manifestly erroneous or clearly wrong. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where the evidence supporting the verdict is not contradicted by objective evidence and is not internally inconsistent, and a fact finder’s finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). See also, Stobart v. State through Dept, of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Although we accord deference to the fact finder, we are cognizant of our constitutional duty to review facts[25], not to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
The State argues that transections of the popliteal artery and vein are known risks of surgery to which the plaintiffs consented. However, as noted in our review of the medical testimony, consent to a risk does not equate to consent to | nsnegligence. The record supports the conclusion that either Dr. Noble slipped *472 when • using the osteotome/chisel, or Dr. Zembo slipped when attempting to protect the vessels with the elevators/retractors, or both. Expert testimony supported the finding that these actions breached the applicable standard of care for this procedure.
Dr. Noble testified that the tran-section of the blood vessels could have been caused by overstriking, or hitting the chisel so hard that it displaced the retractor that had been protecting the vessels. Dr. Zembo testified that although she held the retractors firmly in place, the fact that the transection occurred indicated it was likely that they must have moved from their protective position. It is not unreasonable that the jury found the orthopedists’ conduct to have constituted medical malpractice that caused Shametha to suffer the loss of her leg. The State argues correctly that doctors are not held to a standard of perfection. Ruiz v. Guette, 07-0989, p. 11 (La.App. 4 Cir. 4/23/08), 983 So.2d 959, 965. However, it was not unreasonable for the jury to have accepted Dr. Isaacson’s expert opinion that an aberrant chisel that gets past the retractor through the periosteum to sever the vein and the artery would be below the applicable standard of care. The jury also apparently accepted his testimony, that while this is a known risk of the procedure, it is not within the standard of care. We find the jury would have been reasonable likewise in accepting Dr. Greenwald’s expert opinion that the orthopedic surgeons’ failure to let down the tourniquet after two and a half hours and the transection of the blood vessels would constitute breaches of the applicable standard of care.
This case offers a classic example of conflicting expert opinions concerning the negligence, vel non, of the orthopedic surgeons. While there was ample | ^evidence that Doctors Zembo and Noble conducted themselves within the standard of care for the procedure and their specialties, there was also reasonable contrary testimony on which the jury reasonably could rely. Louisiana’s manifest error rule, as discussed hereinabove, mandates that where the jury has reasonable alternative choices as to credibility, liability and causation, its determination should not be disturbed on appellate review.
The State also contends that even were the orthopedic surgeons properly found to have been at fault, the apportionment to Dr. Hill should be increased, and the orthopedic surgeons’ apportionment should be decreased, to conform to the evidence.
The Supreme Court has recognized the great, even vast, discretion vested in the trier of fact in determining general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It applied that same standard, by analogy, to the fact finder’s allocation of fault among tortfea-sors, for the allocation of fault pursuant to the comparative fault article. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), pp. 7-8, 666 So.2d 607, 610-611. The jury found that Dr. Hill bore more responsibility for Shametha’s injury than the resident, Dr. Noble, and equated his negligence to that of Dr. Zembo. Considering the entirety of the record, we cannot find that the jury abused its great, even vast discretion in making this apportionment of fault as among the three physicians.
The Court having considered the extensive record in its entirety, including the expert testimony given by the defendant physicians and the independent experts called on behalf of the plaintiffs and the defendants and the patient’s medical records, it is clear that the jury’s verdict, and the judgment based thereon, |70are not manifestly erroneous or clearly wrong, but *473 reflect reasonable credibility choices and interpretations of the evidence.
For the reasons stated, we amend the judgment to apply the jury’s fault apportionment to the award of past medical expenses, and affirm the judgment in all other respects.
AFFIRMED AS AMENDED.

. At the time of the incident that forms the basis of this litigation, Doctor Zembo and Doctor Noble were state health care providers covered under the Malpractice Liability for State Services Act, La. R.S. 40:1299.39, etseq. (The MLSSA).

. At the time of the incident that forms the basis of this litigation, Dr. Hill was a health care provider qualified under the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41, et seq. (The MMA).

. The record contains a motion for the second extension filed on behalf of Dr. Zembo, Dr. Noble, and the State.

. While the parties refer to the amount of the settlement in brief as $125,000, the record contains no evidence of the amount.

. Plaintiffs had listed Professor Baier as a witness.

. The final judgment was delayed pending resolution of the issue of the constitutionality of the statutory cap on medical malpractice recovery.

.The Order indicates that it was signed “this 4 day of January, 2009.” Date stamps show the proposed Order was filed on December 22, 2009 and was entered on the court minutes on January 5, 2010.

. This plaintiff was married and subsequently divorced, and gave her married name when called to testify.

. Heparin is an anti-coagulant.

. A fasciotomy is a procedure performed in the area below the knee to attempt to prevent pressure injury to the muscle. Pressure inside the leg causes the small blood vessels, or capillaries, to lose blood flow, and so a very well-known consequence of vascular surgery is compartment syndrome, which the fascio-tomy can relieve. It is done when there is concern about a reperfusion injury from returning blood flow.

. According to the trial transcript, plaintiff counsel offered, introduced, and filed into evidence deposition exhibits P-1 and P-2, identified as photographs, and P-3, which is identified as Dr. Clark's life care report. The exhibits were accepted without objection. None of those three exhibits are in the appellate record.

. The future economic losses are stated in present value.

. Continuing expenses.

. The plaintiff also challenged the constitutionality of the MMA in toto or, alternatively, the purported limitation on recovery provided by La. R.S. 40:1299.42(B)(1) and (2) (the portion of the Act applicable to private qualified providers). Because there were no providers qualified under the MMA remaining as defendants, the trial court entered summary judgment dismissing that claim. That judgment is not at issue on this appeal.

. La. Const. Art. I, § 3.

. La. Const. Art. I, §§ 3 and 12.

. La. Const. Art. I, § 22.

.Therefore, the constitutional test is whether the Act’s provisions are reasonably related to furthering general societal interests. Bazley v. Tortorich, 397 So.2d 475 (La.1981).

. Sibley v. Board of Sup'rs of Louisiana State University, 477 So.2d 1094 (La.1985).

. The plaintiffs did not discuss or cite the Oliver case in their original appellants’ brief. At the time of this writing, the only reported ■decision in Oliver is the one-word denial of the State’s application for supervisory and/or remedial writ to the 14th Judicial District Court and to the Court of Appeal, Third Cir *463 cuit. That reported decision has not been cited in any other reported decision.

. Distinguished in Coleman on an unrelated issue.

. The reference is to Ruiz v. Oniate, 97-2412 (La.5/19/98), 713 So.2d 442.

. In the instant case, the medical review panel ruled unanimously in favor of the health care providers and against the claimant. Therefore, the provisions of the amendment allowing reimbursement of the costs of the review panel bond are inapplicable.

. As plaintiffs note, although the fact of a settlement with Dr. Hill was made on the record, the compromise itself was not introduced into evidence. We find no stipulation or other admitted evidence establishing the amount of the settlement.

. See, LSA-Const. Art. V, section 10(B).